M'RAE and AUGUSTIN *vs.* M'LEAN, for use, &c.

M'RAE and AUGUSTIN *versus* M'LEAN, for use, &c.

·THE QUESTIONS IN THIS CAUSE.

*As to a creditor's lien in attachment; and the effect of a replevy bond thereon.*

*As to a description, in pleading, of the name of an obligee in a bond.*

1. The giving of a replevy bond, under the attachment laws of this State, does not discharge the lien first acquired on the property, under the attachment.

2. So, it is a good plea by the sureties, to a replevy bond in attachment, in a suit against them thereon, that the sheriff was notified to retain the property in his custody, by virtue of the proceedings under which it was attached; and that he delivered possession thereof to a stranger, who eloigned it from the State.

3. An averment, that one promised to pay the plaintiff, "by the name and description of *Duncan*" M'L., &c. is sustained by the production of a bond, made payable to "*D.*" M'L., &c.

In error from Autauga Circuit Court.

This was an action of debt upon a bond, which had been executed by the plaintiffs in error, to the defendant, as a replevy bond in attachment. · Certain slaves, the property of one Thomas J. Augustin, had been attached by one Watson, and replevied by Augustin, who gave the usual bond to McLean, the Sheriff, with the plaintiffs as sureties, conditioned for a return of the slaves, or a payment of any judgment rendered in the case.

The declaration, after setting out the bond in a formal manner, assigned, as a breach of the condition, the non-payment of the judgment rendered in the cause, and a failure to return the property. In

defence, it was plead, first, that the defendants ought not to have been charged, &c., because they said, that while the said sheriff held the said slaves in possession, at the suits of sundry creditors of said Thos. J. Augustin, which had been commenced by attachment, said defendants then and there requested, and notified, said sheriff, to retain said slaves in his custody, by virtue of the said attachment, levied on them by the said Watson, and under which the defendants were bound, &c., and that the said sheriff had afterwards delivered the said slaves to a stranger, who had eloigned and removed them from the State, &c.: and, second, performance of the conditions of the bond sued on, &c.

To the first plea, the plaintiff demurred; and to the second replied and took issue.

On the trial, the court below sustained the demurrer to the first plea, and judgment on issue was had for the plaintiff.

The plaintiff having produced the bond in evidence to sustain his action; it appeared that the same was made to "D. M'Lean," and it was objected on the part of the defendants, that this bond did not sustain the averment, of a bond made to "Duncan M'Lean," as set out in the plaintiffs' declaration: but the Court held the bond proper evidence under the averment, and so it was read to the jury; and the defendants excepted.

The plaintiff having also submitted, as evidence, the judgment and execution in the attachment cause, and proved that no property could be found, the defendants requested the Court to charge the jury, that a notice to the defendants to produce the property, and a demand of it, were necessary to have been

made either by the plaintiff in the attachment, or by the sheriff; but the Court refused so to charge, and informed the jury that it was not essential to prove more than the execution, in the hands of the sheriff, and diligence by him : to which the defendants also excepted. And a writ of error was taken to this Court.

The cause was argued by *Mr. Goldthwaite* for the plaintiffs in error.

HITCHCOCK, J.—This was an action of debt, brought by the defendant in error, in the Circuit Court of Autauga county, against the plaintiffs in error, upon a replevy bond in an original attachment, by the plaintiffs in error, as securities of Thomas J. Augustin, whose good were attached at the instance of one Isaac C. Watson, for whose use this suit was brought. The bond appears to have been given in pursuance of the act of 1818, relating to attachments against absconding debtors, the attachment having issued prior to the act of 1833, consolidating the attachment laws into one act, as the bond appears to bear date the third April, 1830.

The condition of the bond, after reciting the attachment, and the levy by the sheriff, upon certain slaves, the property of the defendant in the attachment, provides, "that if the said Augustin, (the defendant,) or the said M'Rae and Augustin, (the securities,) or either of them, in case judgment should be rendered against the said Augustin, should, immediately thereafter return the said property to the sheriff, or pay and satisfy such judgment as should be rendered against said Augustin, then the bond

should be void." The breach assigned is the non-delivery of the slaves, or the payment of the money.

The defendants pleaded, that on the third day of January, 1831, the sheriff of Autauga county, had the said negroes in his possession, at the suit of sundry creditors, against Thomas J. Augustin, commenced by attachment, and that the said defendants, then and there, requested, and notified, the said sheriff, to retain the said negroes in his custody, under the terms and by virtue of the said attachment, heretofore issued by the said Watson, mentioned in the plaintiff's declaration, and in the writing obligatory aforesaid, and in the condition thereto. That the sheriff afterwards, to wit, on the day and year aforesaid, delivered the said negroes to one Josiah Haic, who eloigned and removed them from the State.

To this plea the plaintiff demurred.

There was another general plea of performance, upon which issue was taken.

The Court below sustained the demurrer, and a verdict and judgment were had in favor of the plaintiff below, and the case has been brought here for revision.

The question which is distinctly presented by the demurrer in this case, is, whether the giving of this bond thereby destroyed the lien, which the attaching creditor had acquired by virtue of his levy, so as to subject the property to a subsequent levy, by other attaching creditors; or whether, notwithstanding the bond, the lien continued, so as to discharge the defendants upon their giving the sheriff notice, as set forth in the plea. If the lien continued, it cannot be doubted; that the condition of the bond was substantially performed. If not, then the defence is in-

M'RAE and AUGUSTIN *vs.* M'LEAN, for use, &c.

sufficient, and the defendants were liable for the amount of the judgment in the original attachment.

This case came before the Court at the last term, and the Court then decided that the lien was discharged, in which I then concurred. Upon an application, a rehearing was granted, and the cause was continued to this term. It has again been argued—this argument, together with the authority produced, and my own reflections, have convinced me that the opinion I then entertained, was wrong. I now entertain the opinion that the lien which the attachment had acquired, was not lost by giving the bond by the defendants.

This being my opinion, I cannot hesitate to avow it, though I do so with great deference to the opinion of the Chief Justice, who still continues to entertain the opinion expressed at the last term. As the other Judge concurs with me in this opinion it becomes my duty to give the reasons which have led us to this result, with all convenient brevity.

The fourth section of the act of 1807, which was the first general law regulating the issuance of attachments, after pointing out the manner in which the sheriff shall attach the goods of the defendant, declares that the "goods, money or effects, so attached, shall *remain in the officer's power,* and be by him secured, in order to answer and abide the judgment of the Court in the case, unless the garnishee shall give security for the same. And, by the fourteenth section of the same act, it is made lawful for the defendant in the attachment, at any time before final judgment entered, or writ of inquiry executed, upon giving special bail, to replevy the estate so attached,

and plead to issue, so that the plaintiff be not there by delayed of his trial.

Without enquiring what kind of bond the garnishee, under the fourth section, should give, we are all agreed, that if the property remains in the hands of the sheriff until final judgment, the levy of the attachment gives such a lien as will continue to subject the property to the payment of it, to the exclusion of all other claims, or subsequent attachments; and, I presume there can be no doubt that the sheriff could proceed to sell the property, by virtue of the levy, without any writ of *fieri facias*, or *venditioni exponas*.

The lien created by the levy, diverts the property, for the time being, out of the defendant, and gives the sheriff a special property in it.    It is taken into the custody of the law, and is "to abide the judgment of the Court in the case," and must be sold as in ordinary cases, when judgment is rendered in favor of the plaintiff in the attachment.

It is equally clear, and it is also admitted, by all, that if the defendant should appear and give special bail, he might take the goods from the sheriff, and thereby discharge the lien.    The person of the defendant was substituted for the goods; the case proceeded as in the ordinary case of *cap. ad respondendum*, and the bail might discharge himself by surrendering the body of the defendant.

Thus the law stood until 1818, when an act was passed which prohibits the replevying of the goods, in cases of absconding debtors, " unless the security in the replevy bond, should undertake to return the specific property attached, or pay and satisfy the

judgment which should be rendered against the defendant."

This act was undoubtedly intended to give additional security to plaintiffs in attachmdnts, as against absconding debtors. The goods were still subject to be replevied, but the conditions imposed upon the security were much more burdensome, and subjected them to much greater liabilities. The act does not, however, subject the securities absolutely to the payment of the judgment. It provides a contingency upon which the bond might be discharged, which which was to be by returning the goods to the sheriff, and thereby placing the plaintiff in the same condition he was, when the levy was first made, and the lien created. This condition is one highly favorable to the securities, and ought not to be lost sight of in construing the statute.

The counsel for the plaintiff in error contends, that the principles which apply, in preserving the lien, in cases of forthcoming bonds, when property is taken in execution upon judgments, are applicable to this case, and he relies principally upon the decision in the case of *Lord* vs. *Ramsey*, reported in 3 Munford, 417.

In that case, the security in the forthcoming bond suffered the property to remain with one Moore, who subsequently suffered the defendant to deliver the same goods to the same officer in discharge of his person in custody upon a *ca. sa.* in favor of a third person, subsequently issued, but before the day for the delivery of the goods, in the forthcoming bond, had arrived. The majority of the Court, Judges *Roane* and *Fleming,* (Judge *Cabell, contra,*) held, that the lien was not destroyed by giving the bond, but

JANUARY TERM, 1836.

145

M'RAE and AUGUSTIN vs. M'LEAN, for use, &c.

continued until lost by the non-delivery of the property by the defendant, or his securities, on the day of sale. I understand that the correctness of this decision is not questioned, by any of us, in this particular case, but, by a part of the Court, is thought not to be applicable to the case of a levy under an original attachment.

I will here remark that the term replevy, in its general sense, includes every return of property levied on, for whatever cause, and under whatever conditions the same may be subject to, whether the lien is continued or discharged, and that the question of lien or no lien, depends more upon the nature of the stipulations entered into in the bond, than upon the particular circumstance which may attend the case. All our injunction and writ of error bonds are replevy bonds; yet there is no lien retained on the property attached, the conditions being to pay and satisfy the judgment or decree of the court, whenever made. I therefore readily admit that some of the reasons urged by Judge *Roane*, in the opinion given by him in the case alluded to, are not strictly applicable to the facts of the case before us. But I think the principles to be extracted from that case, are applicable to this, and that the facts in which they differ do not authorise us to come to a contrary conclusion.

He lays down certain propositions as the basis of his reasoning, most of which appear to me to be applicable to this; such as—

1. That an execution is the life, end, effect and fiat of the law; that it differs from an action, which continues only until judgment is rendered. A writ of attachment, under our law, is, I apprehend, in this

3 v. P.          19

respect, equally comprehensive and efficacious, for, by it, the goods are seized, and held till judgment, and then sold.

2. The law subjects the sheriff to an action, at the suit of a creditor in respect to the goods taken, and he may maintain trespass or trover for them, against a wrong doer: such would be the case when goods are taken by the sheriff on attachment.

3. That by the commmon law, the *fi. fa.* had relation to its test, and bound the property from that time, and that though this lien is restrained by statute to the delivery of the writ to the sheriff, it will, after delivery, prevent all intermediate sales: though this does not apply to a writ of attachment, before a levy, yet it does not militate against the force of the lien after the levy is made.

4. That the general lien on the debtor's goods, is relieved by the particular levy, and that consequently the debt is discharged, and the defendant released from the judgment. The same rule, I apprehend, would apply to a case of a levy by an original attachment, unless otherwise directed by statute. The plaintiff having selected his remedy, must abide by it. But, whether it does or not, the admission of the contrary would not prove, that the continuance of the lien, is incompatible with the giving of the bond.

5. That by the seizure, the property is divested out of the defendant, and in abeyance; and, being so divested, it will require, (he presumes,) clear and explicit acts, or provisions of the law, to revest the same in him, before the execution has performed its office. This position, I think, applies with all its force, to a levy under a writ of attachment.

6. That an execution is an entire thing, and if once lawfully begun must be completed, and that when it has once begun, it cannot be suspended.— This principle, he remarks, would equally reprobate every suspension of the lien, (which is the life of the execution,) unless there be positive words to that effect; and especially, if there be other grounds on which to account for the custody of the goods seized, being granted to the defendant.

It may be assumed that a writ of attachment performs not only the office of commencing the proceedings, but, by virtue of it, all the subsequent proceedings are upheld, and brought to a conclusion.— It commands the sheriff to levy on the goods of the defendant, to pay the specific debt, and by virtue of this power, all the proceedings, to final judgment and satisfaction, are carried out; and what is said by Judge *Roane,* as to the suspension of the lien, applies equally to this as it does to an execution.

Having premised these principles and positions, he examines, at some length, the several statutes of Virginia, relating to forthcoming bonds. He shows that the lien, having been created by the levy on the identical goods siezed, there is nothing inconsistent with the continuance of it, though the debtor has permission to hold them. It is true that he lays some stress upon the shortness of the time between the levy and the sale ; but he does not derive his argument in favor of the lien from that source; neither does he intimate that his opinion would be changed if the time were greater. He expressly says, that, "the latter right, that is, the right to the possession by the defendant, is merely an exception out of the former, for the convenience of the debtor, and whose

custody is, for the time, the custody of the sheriff."
The two interests may well exist together: the one
respects the *right*, the other the *possession* of the pro-
perty.   It is acknowledged, he says, on all hands,
that. if the goods are delivered, the sheriff is to pro-
ceed to sell them.   He is to proceed although no
new lien, or seizure, on them, is revived or created,
and although no power to sell them is given by the
act; when is it, then, but by virtue of the old lien,
that the sheriff is authorised to proceed to sell?

It appears to me that the whole of this reasoning is
applicable to the case under consideration.   The
convenience of the debtor requires it, in one case as
well as in the other, and though the time between a
levy and a sale, in the one case, may be longer than
in the other, yet I do not perceive any objection to
the application of the principle on that account.   If
the lien can be preserved in abeyance for ten days, it
can for as many months; and if, as is admitted, the
object in the two cases is the same, why should not
the same principle be applied to each.   That proper-
ty may, in this way, be incumbered for a long time,
may be an inconvenience, but that does not alter the
rule; for it will be so, if the property is not replevied.
This is one of the consequences which attaches to all
legal proceedings, and applies to injunctions in Chan-
cery as well as to cases of this kind.

It is true, that in the case of an execution, the debt has
been ascertained and matured into a judgment.   But
the presumption of law is in favor of the justice of
the claim, in the case of an attachment.   Oath is re-
quired to be taken of the debt, a bond of indem-
nita is to be given, and justice, we are bound to pre-
sume, will be administered without delay.   With

these circumstances to sustain it, I do not think we can presume any thing against an attachment.— At least, not enough to authorise us to change the rule of decision; if there is no other ground for it.

Judge *Cabel,* in his dissenting opinion, derives an argument against the lien, from the fact that the sheriff, during the stay, cannot interfere with the goods, and he asks what use there is in preserving the lien, when it cannot be asserted except by the voluntary act of the debtor? This, I think, is well answered by Judge *Roane,* by saying that it is to enable the sheriff to sell the goods, if delivered, and to preserve his right to them if they are not And, although it is true, that, in Virginia, since 1769, the forthcoming bond, after forfeiture, has the force and effect of a judgment, and from that time, after forfeiture, the lien is admitted to be lost, yet, he maintains, the same principle as applicable before forfeiture, in order to enable the sheriff to sell them, if delivered to preserve the principles and symetry of the laws, and to hold the debtor's goods liable to his debts, if he, or his securities should deliver them, in ease of his securities.

He asks, in his turn, why the lien is not to continue? and suggests, that it must be to enable a debtor to saddle an innocent security with a debt, due by himself, by releasing the proper fund for that purpose, or to enable a subsequent creditor to get the advantage of a prior one, who has been diligent; for such must inevitably be the consequences of the principle, and, by construction and remote implication, injure securities, under a provision introduced for the debtor's convenience.

The condition of the bond contemplates a return of the property, for the benefit of the securities, and I think, the language of Judge *Fleming* is quite applicable to this part of the case. He says, that, "in his conception, the law cannot step in by its own officer, to arrest and render impossible, to frustrate or obstruct, what the law itself requires, or permits, to be done; especially, when it may tend to the distress and irreparable injury of an innocent third person." This appears to me, to be the proper view of the case, and I cannot agree with Judge *Cabel*, that before forfeiture of the bond, the property can be either sold or levied on, by another attachment or execution.— That the property is to be at the risk of the debtor and his securities, pending the suit, I admit: that they should then have the privilege of returning it, the bond expressly stipulates, and that no principle of law, which will permit any other disposition of it inconsistent with the lien, is to be tolerated, I do not hesitate to maintain.

I do not contend that securities are to be favored in this, more than in any other case; but that the law is to be so administered to them, as to protect their obvious rights, none will deny. They are not officious intermedlers in other men's business. The law contemplates their interference for wholesome purposes, which are not less beneficial to the plaintiff than to the defendant, and it does not seem just to me to turn round and upbraid them for their imprudence for what may, and often will, turn out to their injury, if the principle of continuing the lien is abandoned.

Again, how would the principle stand when applied to forthcoming bonds, given, when property

M'RAE and AUGUSTIN *vs.* M'LEAN, for use, &c.

levied on by execution, or attached in an attachment, is claimed by a third person. Here the bond contains a condition to return the property, if the claimant is cast, or to pay the debt, and the claimant is entitled to the possession of the property, *pendente lite*. Is the lien lost here? If so, what becomes of the securities? Are they to suffer? If the property is taken in execution by another creditor, either of the original debtor or of the claimant? This must be the consequence, on the principle that the lien is lost.

This view of the case may be farther illustrated, by supposing two attachments to be delivered to the sheriff, at the same moment, upon which a levy is made on property only sufficient to pay one, a case which often happens. Here, if no replevy is made, it is clear that each attachment is entitled to its share of the proceeds, though judgment may be recovered on one, a term or more before it is on the other.— But suppose the property is replevied, and judgment is obtained in one case, a term before the other. If the lien is lost by virtue of the replevy, and the property is delivered upon the first, it is clear that it must all be appropriated to that, and when the other is matured into a judgment, the securities, not being able to comply with the condition of the bond, must pay the whole amount of the judgment. Or, if the delivery on the first bond will be a sufficient discharge of the security, the plaintiff in the judgment last obtained, will be without any remedy. If, however, the lien is continued, the delivery of the property upon one, places it in *statu quo*, and it must be appropriated equally, according to the original liens.

Other cases might be put to show the manifest injustice of the doctrine, which denies the continuance of the lien.

I have hitherto treated the case in reference to the provisions of the act of 1818, which is confined to cases of absconding debtors, and which does not prescribe the mode of proceeding in case of forfeiture of the bond. By the act of 1833, this form of bond is extended to all cases of attachment, and the act goes farther, and directs the sheriff to suffer the property to remain in the possession and at the risk of the defendant, and declares the bond to have the form and effect of a judgment in case of forfeiture. I consider, there is no difference, in principle, between the two acts; that so far as the question of the lien is involved, the result is the same, and that, though the act, as it is now in force, assimilates itself more, in all its forms, to the act in Virginia, which has been the subject of comment, yet, that the principle I contend for, derives no aid from that circumstance.

There is one feature of the act of 1833, which it is proper to notice. That act, while it extends the provisions of the act of 1818, relating to the condition of the bond, to all cases of attachment, also retains the provision of the old act as to giving special bail, thereby giving the defendant his election to make either kind of replevy, and although it is admitted that these provisions are open to the defendants election, and that he may, when two cases are pending against him, give the one kind in the one case, and the other in the other, and thereby give one a preference over the other, yet this does not alter the view which I take of this kind of bond, for the same result

may grow out of the case, whether the lien is decided to be retained or not, as he may elect, to which case he will return the property, after judgment, if the lien is decided to be lost; or he may elect to which he will give the lien, when he comes to give his bonds. For this inconsistency in the law, if it be such, we are not responsible. It is for legislation to correct it, if it require it.

I consider the following propositions as sustaining the propriety of the lien :

1. The object of the attachment law is to enable the plaintiff to seek a recovery of his debt, out of the goods of the defendant.

2. The levy of the writ, on the goods, gives a lien, which divests the defendant of his property in them, and gives a special property in the sheriff.

3. The lien having been once created, is not to be discharged, except by positive enactment.

4. That the condition of the bond authorising the redelivery of the property, is given by way of proviso, and operates as an exception, and does not impair the lien, but only impedes its operation pending the suit, and therefore, that the defendant is not restored to his right in the property, but has only a right of possession.

5. That this class of cases is entirely distinct from those bonds that require the obligors to assume a direct liability to pay the debt, such as stay bonds, in Virginia and Kentucky, and our injunction and writ of error bonds.

The result of which is, that, as in this case, the plea avers that the property was restored to the sheriff, before forfeiture; and notice given to him, to apply it

3 v. P.                20

to the payment of the judgment against Augustin, the proviso in the bond was complied with, and the securities discharged; that the plea should have been sustained on demurrer, and that, therefore, the judgment must be reversed.

SAFFOLD, C. J.—An action of debt was brought in the Circuit Court, by Duncan M'Lean, as sheriff, for the use of Watson, against the plaintiff in error, on a replevy bond, dated third April, 1830. The bond recites the issuance of the attachment, in favor of Watson, against the estate of Thomas J. Augustin, and a levy on certain slaves, which had been returned to Augustin, in his lifetime, he having been principal in said bond.

The condition expressed in the bond, was for the return of the property attached, or payment of the debt, in the event of a judgment for the plaintiff, as prescribed by the statute of 1818, in case of absconding debtors.[a] The declaration alleges the execution of the bond in favor of the plaintiff, "by the name and description of Duncan M'Lean, sheriff of said county, his heirs," &c.; then describes it as above, and states the further circumstances relating to the attachment, except that it does not disclose the particular cause of it; whether for the *non residence,* removal, or absconding of the debtor. It charges the rendition of the judgment in favor of Watson, and that a *scire facias* issued thereon, which was put into the hands of said M'Lean, as sheriff, and by him afterwards delivered to Shackelford, his successor in office; yet that the defendant failed to pay the judgment, or deliver the property to either sheriff, though often requested, &c.

The defendants pleaded—

1. That after the replevy of the property as aforesaid, the sheriff of said county had the same negroes in his possession, at the suit of sundry creditors, against said Augustin, commenced by attachments, and the said defendants then and there requested and notified the sheriff to retain them in his custody, under the terms and by virtue of said previous attach· ment. But he afterwards delivered them to one Josiah Huic, who has eloigned and removed them from the State.

2. The defendants also pleaded performance of all the conditions of the bond.

The plaintiff demurred to the first plea, and took issue on the second.

On hearing of the demurrer, the first plea was overruled as insufficient.

On the trial of the second plea, a verdict was returned for the plaintiff below : at which time a bill of exceptions was 'taken, shewing that the bond, when introduced as evidence in support of the action, acknowledged an indebtedness to "D. M'Lean, sheriff," &c. instead of "Duncan M'Lean, sheriff," &c., as described in the declaration; and that for this variance the defendant objected to the reading of the bond as evidence, but the objection was overruled, and the evidence admitted. To which the defendants excepted.

It also shows that the plaintiff introduced, as farther evidence, the judgment and execution, with a return upon the latter of *nulla bona;* also, the original writ of attachment as described in the declaration ; that he farther proved that Shackelford, as sheriff, while the execution was in his hands, endeavored to

find property, and could not; but that there was no farther proof of notice to the defendants to produce the property, or of any demand having been made. That on this evidence the defendant moved the Court to instruct the jury, that demand and notice were necessary to entitle the plaintiff to recover; which instructions the Court refused, and charged the jury that it was only necessary to prove that the execution was in the hands of the Sheriff, and diligence by him. To this also, the defendants excepted.

The matters assigned as erroneous, are the following:—

1. The overruling the first plea on demurrer.

2. The Court admitted the bond in evidence.

3. The instructions given to the jury; and the refusal to instruct differently, as requested.

1. The first assignment presents the question whether the replevin bond operated as a release of the property, so as to discharge the lien created by the attachment.

I would premise, that, as there appears no available objection to the bond, as a statute bond; as it was declared upon as one regularly taken by the sheriff, in permitting a replevy of the attached property, and is in the form prescribed in cases of absconding debtors, a sufficient presumption exists that such was the ground of the attachment, to supersede the necessity of any more definite averment of the fact If the fact were otherwise, it would have been available as matter of defence. Where the bond has not been taken, pursuant to the statute authorising the replevy, and has been sued upon merely as a common law bond, as in the case of *Sewall* vs. *Franklin, et al.* (decided at last term,[a]) and the non-delivery

[a] 2 Porter's R. 493.

M'RAE and AUGUSTIN *vs.* M'LEAN, for use, &c.

of the property has been assigned as the breach, the amount of damages sustained cannot appear, without a shewing of the inducement for the bond, and the consequences of the non-performance of the condition. These facts could not be required to be proved, unless averred in the declaration. In such cases it is necessary to aver them, but not so in a duly executed replevy bond, where the plaintiff has the benefit of the legal intendment, created by the authority under which it was taken, together with the presumption that the officer taking it has duly performed his trust.

I have no hesitation in saying, that the levy of an attachment on personal property of the defendant, creates a lien upon it, which, if nothing be done to destroy it, such as a replevy will continue, until it be appropriated in satisfaction of the debt. That such is the effect all attachments of property, as well on the ground of removal, or non-residence of the debtor, as of his absconding. At the time of the institution of this suit, it was only in cases of the latter kind that bonds for the return of the specific property were authorised. In cases of the former kind, it is entirely clear that a replevy of the property discharged the lien, for it was effected by giving special bail, merely; thereby placing the defendant, his securities and the plaintiff, in the same relation to each other, as if the suit had been commenced and the bail required by the ordinary process.

By the statute in force at the institution of this suit,[a] a different security was afforded to the creditor in the event that his debtor absconded. In such case the property could be replevied only on bond and security being given for a return of the specific property,

[a] Ala. L. 21

or the payment of the judgment that might be rendered in the suit.

To what extent any of these principles might have *Aik. D.31 been varied by the subsequent statute of 1833,[a] it is unnecessary to inqure, as this case must be governed by the previous acts. It is, however, worthy of notice, that, by this latter act, the defendant, his attorney, agent or factor, has his election, in all cases, to replevy, as was done in this, or by merely giving special bail.

If, prior to the levying of the subsequent attachments on the property, which placed it a second time in the hands of the sheriff, as averred by the plea, the former lien had been discharged, so that it had become subject to other liens, or to the disposal of the defendant, it necessarily results that the notice and request of the securities that it should be retained for the satisfaction of this demand, could not have the effect to restore the lien, or to influence the duties of the sheriff in relation to it.

The case of *Harrison vs. Wilson*,[b] involved a ques- *2Mar.549 tion of lien, bearing a strong analogy to the present. It appeared that one Thomas, against whom Harrison, as deputy sheriff, held a *fieri facias*, at the time, sold and delivered a quantity of iron to Wilson. Afterwards the execution was replevied by Thomas and several persons as his securities in the replevy bond. For the purpose of indemnifying his securities, Thomas had executed to them a mortgage on other property. Subsequently, the replevy bond having become payable, a *fieri facias* issued thereon, against the estates of Thomas and his securities, and in virtue thereof the iron was taken and sold by Harrison, who still continued deputy sheriff. For this, Wilson brought his

M'RAE and AUGGSTIN *vs.* M'LEAN, for use, &c

action of trespass, against Harrison. The replevy was authorised by a statute of that State, on bond and security being given by the defendant for payment of the judgment, within three month, which if forfeited, was to have the force and effect of a judgment, and execution might issue thereon, against the defendant and his securities; and be endorsed by the clerk, that "no security shall be taken." It was further provided, that after the execution of such bond, the estate of the defendant should be released, or returned to the defendant. It does not appear that the first execution, in that case, had been actually levied on the iron; but, as the lien had been created, the principle is considered the same, so far as is material to our present inquiry.

The question, whether the lien created by the execution which issued on the forfeited forthcoming bond, related back to the date of the former, so as to overreach the sale of the iron, as the former had done; was brought before the Supreme Court of Kentucky. That Court decided, that unless the iron was purchased by Wilson with a fraudulent intent, it was perfectly clear that the sheriff was not justifible in taking and selling it under the execution.— That the lien under the first execution was discharged by the replevy bond; and, that that created by the second could not be so translated and attached to the former as to justify the sheriff.

If the case referred to, be in principle distinguishable from the one under consideration, it must be alone for the reason that in this, the condition of the bond was in the alternative for the return of the property, or the payment of the condemnation money— in that for the payment of the judgment simply.—

160                    CASES DETERMINED

M'RAE and AUGUSTIN vs. M'LEAN, for use, &c.

But I think it will appear, in the course of my re-
marks, that this difference cannot vary the continu-
ance of the lien.

The same principle was fully investigated in the
case of *Lusk* vs. *Ramsey*,[a] which has been referred to,
and mainly relied upon by the present plaintiff in er-
ror. That was the case of a forthcoming bond, giv-
en for the delivery of goods on the day of sale.—
Ramsey, one of the securities, had explained to Lusk
the defendant in the execution, in the presence and
hearing of the sheriff, who had the goods in his pos-
session, that they were to remain in the possession
of himself and the other securities, as an indemnity
to them until the day of sale, to which Lusk had
consented, and, after the execution of the bond, plac-
ed the property in their possession, with the key
of the room in which it was stored. Lusk retook
the property from them, and delivered it to the same
sheriff, in discharge of his body from a second exe-
cution in favor of a different plaintiff, and the same
being sold under the second execution, the securi-
ties were prevented from delivering it as required by
the condition of the bond. After which, Ramsey
alone having been proceeded against on the bond, he
filed his bill in Chancery against Lusk, the sheriff,
and others concerned, stating the circumstances;
charging fraud and combination, and praying a per-
petual injunction of the proceedings against him.—
The Court decided that the prior lien had not been
discharged by the forthcoming bond; that it continu-
ed until the forfeiture of the bond, but no longer:
consequently, that the security had a right to deliv-
er the property on the day of sale, if he could then
peaceably obtain possession of it. It was also held,

[a] 3Mun.417

under the circumstances of that case, that the security was entitled to relief. To these conclusions I cheerfully assent, on the ground, that there was a valid agreement by which the security was placed in possession of the property for the purpose of his indemnity. It is to be observed however, that the question there, related to a forthcoming, not a replevy bond; to a bond the object of which was merely to insure a re-delivery of the property, taken under execution, within a short time, on the day of sale. The nature of the procedure clearly contemplated an early sale of the same property, in satisfaction of the identical final process. That question was, therefore, essentially different from the one before us.— Here, after the replevy, no sale could be made of any of the defendant's property, until the termination of the suit, then just commenced; the sale could at no time be made unless in the event of a recovery in the attachment suit, and a failure to pay the judgment without; nor was there any authority, in the events supposed, for the issuance of a *venditioni exponas*, for the sale of the specific property.

But in the Virginia case, *Lusk* vs. *Ramsey*, the Judges also examined the doctrine of liens, under their replevy bonds, as authorised by statute, similar to the statute of Kentucky, to which I have referred, and by virtue of which defendants could obtain a stay of execution for three months. It was unanimously conceded by that Court, that such replevy bonds did release and discharge the property previously levied upon. They justly considered the true policy of the law to be, not to permit, such property to be bound, and its alienation fettered or restrained;

that the security in the replevy bond was responsible, generally for the satisfaction of the debt, either by means of the same, or other property or money.—— They also held, in that case, that after the forfeiture of even a forthcoming bond, the lien was discharged.

The effect of a replevy, in an attachment case, is much less favorable to the preservation of the lien, than either of the others noticed, for the reasons already alluded to, i. e. the uncertainty, as respects the ultimate recovery, the great lapse of time necessary to determine it, and the danger and inconvenience to the community, from having the titles to personal property so long incumbered. The securities embark voluntarily, and may, if thought necessary, require an express lien on the same or other property, for their indemnity; otherwise they should, as other securities, risk both the ability and integrity of their principal; except so far as law or Chancery will relieve them, on timely application, against danger not previously provided against.

As the case referred to of *Lusk* vs. *Ramsey* is to govern the decision of this, I will investigate its principles more thoroughly, to test its authority, and see how far Judge *Roane's* reasoning is sustainable and applicable to this case. It is to *his* views, merely concurred in by Judge *Fleming*, and mostly on questions inapplicable to the case before him, that I object. That his opinions are entitled to high respect, I am free to admit On this principle, however, he was opposed at the time, by a very full and learned opinion of Judge *Cabel*, the three constituting the Court. As already remarked, these opinions were given in a case so far different from this, as is an execution from the leading process in a suit. Forthcoming bonds

M'RAE and AUGUSTIN *vs.* M'LEAN, for use, &c.

are taken to alleviate the force of executions, which even before levied acquire liens on all the defendants property. Not so in the case of attachments, they create no lien until the property be actually seized, then it is confined to the articles taken. The balance of the defendants property, has not been, nor can it be, affected by the suit, during its pendency.— After the termination of the suit, if judgment be obtained, I apprehend an execution may issue upon it, against all the defendant's goods and chattels, lands and tenements, as in ordinary cases. Such would, doubtless, be the correct course, where the property has been replevied. An execution, in virtue of which alone, a forthcoming bond can be taken, cannot issue until the debt or demand has been definitely ascertained by the final adjudication. The replevy bond is intended as a security for a claim which may never be established; or if proved, satisfaction is not contemplated in less than one or more years from the time of the replevy, and a half a dozen may intervene, during which the défendant has the absolute use, control and *disposal* of the property. I consider his right to sell it unfettered by the slightest lien, undeniable—all admit that a mere failure or refusal to deliver it on the day of sale, operates as a discharge of the lien, if any existed.

It would appear to me an anomaly in jurisprudence, that the debtor should enjoy the full benefit, and unrestricted right of disposing of the property during the pendency of the suit—a perfect discretion whether this property shall go in satisfaction of the attaching creditor's debt, yet that it shall be exempt, during all this time from the claims of other creditors.

In the case referred to, Judge *Roane* seems to ad-

mit, even in case of the Virginia forthcoming bonds, that the lien is destroyed, that the lien is destroyed, except during "the mere pittance of time comprised in the day of sale;" but contends that this is necessary " to enable the sheriff then to sell; to preserve the principles and symetry of the law, and to hold the debtor's goods liable to pay his debts, (*if he or his securities should deliver them,*) in ease of his said sureties."

This I take as a farther admission that the sheriff could not reseize the goods, even on the day of sale, unless delivered to him; and I deny the authority of the security to deliver the property, unless in virtue of a contract with the principal to that effect, or of his consent in some way given. The common law authorising the bail, on the authority of a bail piece, to arrest and surrender his principal, does not apply to the delivery of attached property. If the necessity of it were admitted to be the same, it is very clear that neither the common or statute law has conferred the power. The Chancellor, whose decree was affirmed in *Lusk* vs. *Ramsey*, admitted the validity of the sale of such property by the defendant, if *bona fide*, and to a vendee, without notice of the execution and forthcoming bond.

On this point Judge *Cabel*, (in the same case,) remarks, that, "if the sheriff, by receiving the delivery bond, parts with the possession of the goods, has no right to seize them, is in no manner liable for them, can bring no action concerning them, nor take any measures to compel their delivery, it would seem to be a necessary inference, that the execution retains no vestage of lien on the goods; 'there is no person who can make title to them by virtue of the execu-

tion,' and of course the debtor is restored to all his rights over them." He further says, "I presume there can be no doubt that the principal in a delivery bond, has the legal right, which no court can obstruct, to forfeit his bond, by failing to have his property forthcoming on the day appointed for its delivery and sale. He incurs thereby the penalty annexed by law, and that is all that others can require of him. If he has the right to hold back his property on the day of sale, by means whereof the bond becomes forfeited, and the execution is at an end, *cui bona*, and on what principle shall he be prevented from making any disposition of it he may please, before the day of sale? This power of previous disposition of the property forms, in my opinion, one important ingredient in the policy of our laws on this subject, and has often been exercised to the great benefit of defendants, whilst it can never injure plaintiffs in execution. He also insists there is nothing in the case of securities of this kind, to distinguish them from other securities, that having arrested the process, (even in case of execution,) by their own voluntary act, by their confidence either in the integrity of the defendant, in delivering the property, or in his ability to pay the debt, or to indemnify them for the failure, they have no right to complain that they have been disappointed and defrauded; that the loss should fall on those who have imprudently trusted the defendants, and not on his just creditors, who but for their interference, might long before have received their debts. The same may be said with equal propriety in this case.

It is important to observe that, in another material point, the principle of Judge Roone's opinion does

not apply to cases like the one under consideration, to any replevy of *attached* property. He admitted, as I have shewn, that the sheriff's control over the property is revived and continued for the one day only—the day advertised for the sale of the property. How can the principle be applied to this case?—When was the property to have been delivered?—Must it have been on the day of rendering the judgment, (should this ever happen,) on the day of the receipt of the execution by the sheriff, (if casually known in time,) or should it be delivered on some day when the property might be advertised for sale? Neither proposition is sustainable: not, surely, either of the two first. The latter, I think, is fully answered, by saying, *the execution cannot be considered as levied, or binding, on that or any other property until the sheriff receives it: moreover, a delivery of the attached property to the sheriff, after the execution has been placed in his hands for collection, or his seizure of it,* or *other property of the defendant, as in case of an original levy, would be indispensable, previous to any advertisement for a sale.* Then, which day is to be considered " the mere pittance of time," during which the sheriff's control over the property is revived and continued.

The language of our statute is, that on the execution of the replevy bond, in case of attachment, "the officer shall suffer the property to remain in the possession, and at the risk of the defendant." This, it is true, is, in part, the language of the Virginia statute, authorising their *forthcoming* bonds on *execution.* The latter, however, defines the time that the property is thus to remain—it is until the day of sale; a limitation inapplicable to property taken under attach

M'RAE and AUGGSTIN *vs.* M'LEAN, for use, &c

ment, for the reasons I have mentioned. Judge Roane lays great stress on these words, in the construction of the stetute of that state. He contends they are indicative of a right in the sheriff, and inconsistent with the idea of an absolute and exclusive ownership in the debtor. He also mentions, that the omission to provide in that statute, for the *restoration* of the property at the time of giving the bond, and the direction for its restoration only in the event of payment, or tender of the debt, on the day of sale, is conclusive that it was the latter, and not the former circumstance which could release the lien.

Whatever may have been the just influence of this language, in the construction of the Virginia statute, containing both forms of expression, and providing for the satisfaction of executions, which are the end of the law, I can not ascribe to them the same talismanic influence, when used in relation to the replevy of property taken under our attachment law. But, even if the same be allowed them, so far as they go, the same result does not necessarily follow; because, in several material respects, the language bearing on the point is different: 1st—that our statute is indefinite as to the time of delivery, when the other is certain, (as already shewn;) 2d—ours directs no other *restoration* of the property, than that provided on the execution of the bond; nothing being expressed as the consequence of making payment on the day, similar to the Virginia direction for then restoring the property. The defendant would, doubtless, continue to hold it, unless he had previously parted with it: but this he would do without the agency of the sheriff, in virtue of his possession under the replevy, and his election not to suffer it sold; and this, equally

whether the money were paid or not.  3d.  The bond required by our said statute, contains the condition, that the security 'iould return the specific property attached, or pay and satisfy such judgment as might be rendered against the defendant.   The Virginia forthcoming bond is conditioned, simply for the delivery of the property *on the day of sale*, at the expiration of a definite term of only three months, and this after a final adjudication of the debt.

In the case before us I recognise no authority in the sheriff to have refused to levy the subsequent attachments on the same property which had been replevied under the former, unless other property could have been found, which is presumed not to have been the case, nor do I think he had any discretion to refuse the second *replevy of the property*, by virtue of which Huic obtained the possession.

As a farther illustration of the consequences of the principle to be established by this decision, a brief notice may be taken of the existing statute on this subject, passed a few years after this bond was given, and which, consequently, does not govern it.— The act of 1833 revised and consolidated the attachment law.   The 11th section authorises the defendant, his agent, &c. to replevy the property in *all* cases of attachment, on giving bond and security, "conditioned, that if the defendant be condemned in the action, he shall return the specific property attached, and in case he fail to do so, the securities will do it for him."   The 13th. section retains the provision of the earlier statute, (applicable to attachments for other causes than the defendant's absconding,) that "any person against whose estate an at-

JANUARY TERM, 1836. 169

M'RAE and AUGUSTIN vs. M'LEAN, for uso, &c.

tachment has issued his or her attorney," &c. "may at any time before final judgment entered, or writ of inquiry executed, *upon giving special bail*, replevy the estate so attached, and plead to issue."

Both these provisions now apply equally to attachments for any or all the causes for which attachments can issue, and abolish the distinction between the mode of replevying in the case of absconding debtors and others; consequently, defendants in an attachment will have their election under this statute, to replevy in either form, in all cases. I can not suppose the legislature intended to submit the discretion to the defendant by his mode of replevying, either to continue or discharge the lien : such must be the consequence of sustaining this lien.

My doctrine is, that the lien by either mode of replevy is discharged. If replevied in the manner this was, that the sureties are bound for the debt, in the event of a recovery against a defendant, unless they deliver the attached property, unincumbered by any subsequent title or lien, to the sheriff, after the execution shall be placed in his hands for collection. If delivered, that the *fi. fa.* alone, without the aid of the levy of the attachment would give him all necessary authority to sell. If, however, the debt be satisfied out of other property of the debtor, or his money, the security would, of course, be discharged. If the replevy be made by giving only special bail, it is clear the lien is discharged and the securities subject to only the same responsibility of other bail.

2. The second assignment presents the question, whether an averment of indebtedness or a promise to pay the plaintiff " by the name and description of

3 v. P.          22

Duncan M'Lean, sheriff of said county," is sufficiently sustained by the production of a bond in all other respects the same, except that the christian name Duncan, is represented by the initial D. In considering this question, the inquiry is natural and proper, whether any doubt or uncertainty respecting the name of the obligee exists, when Duncan M'-Lean, sheriff, &c. is the plaintiff, and the declaration charges the acknowledgment to have been made to him? Would not this have been a sufficient averment of that fact? If there was reasonable certainty as to the obligee's name, and a sufficient averment of an acknowledgment of the defendant's indebtedness to him, the addition of the words that it was to him by the name and description of "Duncan," instead óf D. could introduce no other or different name. The effect is considered the same as if Wm. had been inserted for William. It is true that the latter abbreviation could represent, with propriety, no other name, when D. might represent a variety of others: but here the correct description of the parties in other parts of the declaration, precludes the idea that any other was intended. The description of the obligee, I take to be this in substance, this, that the defendants acknowledged themselves indebted to the plaintiff, by the name of Duncan M'Lean, also describing him as "sheriff of said county" (the declaration having previously disclosed his proper name.) Then, if, under the circumstances, the court and jury could have interpreted the name of the obligee to be no other, there was no authority for rejecting the bond when offered in evidence. I think it could have been understood in no other light.

The case relied upon in argument to support this

assignment, is *Peas* vs. *Morgan.*[a]   There, Morgan had declared against John B. Peas and George Peas for that, " whereas, the said John ' B. and George," on, &c., made their note in writing, their own proper hands and names being thereunto subscribed, " by the name and description of John and George Peas." It appeared in evidence that one only of the defendants had signed the note; for this variance the defendants objected to its introduction as evidence. The Supreme court held the note to have been inadmissible. The reason given was, that the declaration contained no averment that the defendants were partners, or acted under the firm of "John and George Peas;" but that the contrary was implied by the charge that the defendants made the note, "their own proper hands and names being thereunto subscribed." That as the proof showed that only one of the defendants signed the note, it was different from that declared on.

That case is considered materially dissimilar to this. In that, the note offered in evidence was variant from the one described both in form of execution, and in legal effect, no less so than is a partnership, from an individual transaction.

An English case is given in a note to the above, nearly resembling it, in which the variance was not considered fatal, *Jones et al.* v. *Mar et al.*[b] There, the declaration being against the drawers of a bill of exchange, stated that the defendants made the bill, their own proper hands being thereunto subscribed, and the bill produced in evidence was drawn in the name of Mars & Co. It was objected that this was a fatal variance. But Lord *Ellenborough*, though expressing some doubt on the subject, refused to *non suit*

*margin: [a] 7 John.R. 467*
*margin: [b] 2 Camp. 305*

the plaintiff. In another case, *Levy* vs. *Wilson,*a it was ruled that a bill endorsed by *procuration,* was not evidence under an averment that the defendants indorsed it, his own hand writing being thereunto subscribed. This latter case, admitting its authority, is also essentially different from the one before us. It may often be material, especially in England, where proof of instruments declared on is generally required, to inquire whether they were executed by the defendant in person, or by another, professing to act as his agent or attorney.

The case of *Sheehy* vs. *Mandeville,*a affords more plausibility to this exception. In that case the note was drawn payable sixty days after date, and was signed R. B. Jamison. The declaration described it as a note signed by the defendant, under the name, style, title and firm of *Robert* B. Jamison, and omited to state when it was payable. The note having been rejected as evidence on account of the variance, the decision was revised in the Supreme court.— There, the only variance insisted on by the counsel, or noticed by the Court, was that relating to the time of payment. On the well settled principle, that a promise to pay, without reference to any future time for payment, must be construed into a promise to pay immediately, the court held the variance material and fatal. It was clearly so. As no notice was taken of the differenee between R. B. Jamison as subscribed to the note, and Robert B. Jamison as laid in the declaration, the latter having been given as a matter of special description, it is a fair inference that the name was considered the same, written in either form.

M'RAE and AUGUSTIN *vs.* M'LEAN, for use, &c.

But, it is the language of Chief Justice *Marshall*, in delivering that opinion, which affords most plausibility to this exception. When, however, his remarks are understood as referring to the facts of that case, no difficulty can arise. He says, courts being established for the purpose of administering real justice to individuals, will feel much reluctance at the necessity of deciding a cause, on a slip in pleading, or on the inadvertency of counsel. They can permit a cause to go off, on such points, only when some rule of law, the observance of which is deemed essential to the general administration of justice, peremptorily requires it." That one of these rules is, that in all cases on special agreements or written contracts, the contract given in evidence, must correspond with that stated in the declaration." That, "it is not necessary to recite the contract *in hæc verba;* but, if it be so recited, the recital must be strictly accurate. If the instrument be declared on, according to its legal effect, that effect must be truly stated. If there be a failure in the one respect or the other, an exception, for the variance may be taken, and the plaintiff can not give the instrument in evidence."

Admitting the principle, as above stated, I think, it sufficiently appears, from the views already advanced, that the names in question, in this suit, are identical: that, though one is a literal copy of the other, which is the more approved form, when attempted to be given as a special description, or *in hæc verba*, yet, there is no substantial variance: the literal import and legal effect of the description are the same, in the manner and form presented in this record.

3. With reference to the last assignment which was not particularly relied upon in argument, it only remains for me to say, that my opinion, as expressed, that the lien on the property had ceased, supersedes any inquiry respecting the necessity of having demanded the property. Under a different conclusion on this point, I should think, the question, whether the demand was not necessary before proceeding on the bond, worthy of consideration.

My own opinion is that the judgment of the Court below should be affirmed, but the majority think otherwise on the first point, involving the question of lien.